## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EUROFINS VENTURES, B.V., )
)
           Plaintiff, )
)
           vs. )      Civil Action No. 08-481-MLC
)
OPERON HOLDINGS, INC., )
JAMES HUDSON, and )
PATRICK WEISS, )
)
           Defendants. )

## DECLARATION OF RICHARD J. MARSDEN IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

OF COUNSEL:

Stephen C. Carlson
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

George E. Knox, Jr.
P. Scott Arnston
Jeffrey T. Kelly
Lanier Ford Shaver & Payne, P.C.
200 West Side Square
Suite 500, P.O. Box 2087
Huntsville, AL 35804
(256) 535-1100

Dated: August 22, 2008

Philip A. Rovner (#3215)
Suzanne M. Hill (#4414)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
shill@potteranderson.com

*Attorneys for Defendants*
*Operon Holdings, Inc., James Hudson*
*and Patrick Weiss*

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EUROFINS VENTURES, B.V. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:2008cv00481 |
| | ) | |
| OPERON HOLDINGS, INC., | ) | |
| JAMES HUDSON, and | ) | |
| PATRICK WEISS, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF RICHARD J. MARSDEN
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

I, Richard J. Marsden, declare as follows:

1.    I am a member of the law firm of Lanier Ford Shaver & Payne P.C., counsel of record for Defendants, Operon Holdings, Inc. ("Operon"), James Hudson, and Patrick Weiss.

2.    I submit this declaration in support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.

3.    Attached hereto as Exhibit A is a true and correct copy of a Contribution Agreement (not including the exhibits to the agreement) to which Operon and the plaintiff, Eurofins Ventures B.V. ("Eurofins"), are parties.  Attached as exhibits B through J are true and correct copies of correspondence among Operon, Eurofins,

Eurofins Finance, S.A., and Eurofins Genomics B.V., or between attorneys representing the parties.

4.    Along with Operon's CEO, Mr. Weiss, and two other attorneys representing Operon, I attended a dispute resolution session held in New York City on July 30 and 31, 2008 in accordance with Section 6.07(a)(i) of the Contribution Agreement. Eurofins was represented at the meeting by a company officer and an attorney. At the outset of the meeting, I asked Eurofins' attorney whether we were in agreement that the meeting was a settlement conference and that statements made at the conference could not be used by either party in any subsequent proceeding. Eurofins' attorney responded that he agreed, "as long as it goes both ways." I replied that the agreement would, of course, apply to both parties.

5.    During the meeting, Eurofins' attorney referred several times to a potential arbitration proceeding if no settlement was reached. After one such reference, the other attorneys for Operon stated that Operon does not concede that all potential claims are governed by the arbitration provision contained in the Contribution Agreement, and that some potential claims could be pursued in court, including an Alabama court. No Operon attorney or representative stated that no aspect of the parties' disputes was subject to arbitration. No Operon attorney or representative addressed whether any specific aspect of the parties' disputes was

2

arbitrable.  Neither Operon's attorneys nor its CEO stated that Operon refused to arbitrate any particular aspect of the parties' disputes.

6.      At the conclusion of the dispute resolution session, the parties did not identify any "next steps" in the negotiation process.  Neither party, however, made any statement to the effect that their efforts to resolve their disputes had "run their full course."  The parties mutually agreed to conclude that session.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 21, 2008.

_____
Richard J. Marsden

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on August 22, 2008, the within

document was filed with the Clerk of the Court using CM/ECF which will send

notification of such filing(s) to the following; that the document was served on the

following counsel as indicated; and that the document is available for viewing and

downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

> Richard E. Kirk, Esq.
> Stephen Brauerman, Esq.
> Bayard, P.A.
> 222 Delaware Avenue, Suite 900
> P.O. Box 21130
> Wilmington, DE  19899
> rkirk@bayardfirm.com; sbrauerman@bayardfirm.com

I hereby certify that on August 22, 2008 the foregoing document was sent by

E-mail to the following non-registered participants:

> Daniel P. Goldberg, Esq.
> Michael Hanin, Esq.
> Kasowitz, Benson, Torres & Friedman LLP
> 1633 Broadway
> New York, NY  10019
> dgoldberg@kasowitz.com; mhanin@kasowitz.com

> /s/ Philip A. Rovner
> Philip A. Rovner (#3215)
> Potter Anderson & Corroon LLP
> Hercules Plaza, P.O. Box 951
> Wilmington, Delaware 19899
> (302) 984-6000
> E-mail: provner@potteranderson.com

# EXHIBIT A

**EXECUTION COPY**

CONTRIBUTION AGREEMENT

This Contribution Agreement (this "Agreement"), dated November, 21 2007, by and among EUROFINS VENTURES BV, a Dutch entity ("Eurofins" or "EVBV"); OPERON HOLDINGS, INC., a Delaware corporation ("Operon"); and QIAGEN NORTH AMERICAN HOLDINGS, INC., a California corporation ("QNA").

BACKGROUND:

On the date hereof, unless otherwise indicated below, and at the time of "Closing" (defined below) under this Agreement:

1. Eurofins wholly-owns Eurofins Genomics BV, a Dutch entity ("EGBV"). EGBV's assets consist solely of: (a) the capital stock and debentures of MWG Biotech AG, a German entity ("MWG"), described on Exhibit A-1 (the "MWG Shares and Debentures") and valued in accordance with Exhibit A-2, and (b) all of the capital stock of Eurofins Genomics Inc., a Delaware corporation ("EGDel"). EGBV's pre-"Closing" debt (the "Pre-Closing EGBV Debt") to "Finance Entity" (defined below) will be paid (the "Payment") (using a combination of capital contributions of Operon and Eurofins contemplated by paragraph 7 of "Background" below and the "Mezzanine Financing" contemplated by paragraph 8(e) of "Background" below, after which EGBV is not anticipated to have any material assets or liabilities. EGDel has no material assets or liabilities, but will have funding (a combination of capital contributions and loans) of approximately twelve million seven hundred thousand dollars (US$12,700,000) from EGBV at Closing.

2. MWG is a holding company which (a) owns: (i) all of the shares of capital stock of Eurofins MWG Synthesis GmbH, a German entity ("MWG Production"), (ii) forty eight and one-half percent (48.5% ) of the shares of capital stock (the "MWG Sales Shares") of Eurofins MWG GmbH, a German entity ("MWG Sales"), representing forty eight and one-half percent (48.5%) of the capital and dividends, and fifty one percent (51%) of the voting power, of MWG Sales, (iii) all of the shares of capital stock of MWG Biotech Inc., a Delaware corporation ("MWGUS") and of MWG-Biotech S.r.l., Florence, Italy (an entity which is being dissolved) which together with MWG Production and the MWG Sales Shares constitutes all of the assets and business of MWG other than "MWG India" (defined below)), and (iv) all of the shares of capital stock of MWG-Biotech Pvt Ltd., Bangalore, India, an Indian entity ("MWG India") which by Closing will be transferred to Eurofins (the "MWG India Transfer") for 105,000 Euros, (the purchase price also includes payment of all debt owed to MWG Biotech AG, or any of its affiliates), with the effect on the value of EGBV indicated on Exhibit B, (v) the building described on Exhibit C-1 (the "MWG Building"), which will be treated as an asset held for sale at the Test Date (for approximately three million four hundred thousand Euros (3,400,000 Euros)) with the effect on the value of EGBV indicated on Exhibit C-1 and as to which Eurofins will guarantee to EGBV that (x) the sales price of the MWG Building will be no less than the value for it set by the accountants in MWG's balance sheet at the Test Date and (y) the annual rent to be paid by MWG with respect to the MWG Building after its sale will not exceed thirteen percent (13%) of its sales price. Eurofins Medigenomix GmbH ("Medigenomix") owns the remaining shares of capital stock of

MWG Sales (the "Medigenomix MWG Sales Shares") and at Closing, EGBV will be granted an option (exercisable until March 31, 2008 by EGBV or its designee) to purchase the Medigenomix MWG Sales Shares for approximately 26,550 Euros (the amount of capital increase attributable to such shares) (the "MWG Sales Option").

3. Operon is wholly-owned by James R. Hudson, Jr., Cynthia H. Jackson, Thomas J. Howard, James R. Hudson, III, Ben Robin Howard, III, Patrick Weiss and Violette Weiss.

4. Operon owns eighty four percent (84%) of the capital stock of Operon Biotechnologies, Inc., a Delaware corporation ("OBI") and QNA owns sixteen percent (16%) of the capital stock of OBI (the "QNA OBI Shares"). OBI wholly owns Phoenix Acquisition Inc., a Delaware corporation ("Phoenix"). Phoenix wholly owns (a) Operon Biotechnologie GmbH, a German entity ("Operon Germany") which conducts Operon's business outside of the US and Japan, and (b) Operon KK, Japan, a Japanese entity ("Operon Japan") which conducts Operon's business in Japan, will be sold prior to Closing and will be carved out of OBI's consolidated financial statements with the effect on the value of OBI indicated on Exhibit E.

5. By Closing: (a) Operon Japan will have segregated the assets and liabilities related to the Air China silent partnership ("Air China") described on Exhibit F currently belonging to Operon Japan with the effect on the value of Operon Japan indicated on Exhibit F and obtained the unconditional guarantee from Operon against any net loss related thereto ("Air China Guarantee"), and (b) OBI will have distributed or unconditionally committed to distribute to Operon the assets held for sale listed on Exhibit G-1 ("Assets Carve Out") with the effect on the value of OBI indicated on Exhibit G-1. Immediately after Closing, OBI will repay the inter-company loan due to Operon (the "OBI I/C Loan") listed on Exhibit G-2 with the proceeds of the sale of Operon Germany and Operon Japan. . At Closing, OBI will have debt in the amount of dollars (US$2,535,000 plus accrued interest based on 12/31/06 figures) to James R. Hudson, Jr. (the "JH Debt") and debt to Qiagen Sciences, Inc. ("QSI"), a Maryland corporation, in the principal amount of US $4,397,165 and in the amount of US $1,413,433.82 (for certain RNA equipment) the ("OBI Debt").

6. QNA and QSI are wholly-owned subsidiaries of Qiagen NV, a Dutch entity ("Qiagen").

7. Eurofins, Operon and QNA desire that: (i) EGBV act as the vehicle for the purposes described in this Agreement; (ii) Eurofins retain seventy two percent (72%) of the capital stock of EGBV and that Eurofins make a capital contribution of ten million dollars (US$10,000,000) consisting of (I) the equity value of EGBV at September 30, 2007, plus (II) the difference between the capitalized value of the MWG Shares and Debentures and the agreed value of MWG determined by the formula set forth on Exhibit H (generally, percentage ownership x relevant turnover x 65% +/- the difference between actual Net Working Capital and target Net Working Capital and actual Net Debt and target Net Debt), plus (III) a cash contribution that is determined after the 2007 third quarter reviewed numbers are available as indicated on Exhibit H and in accordance with

2

Exhibit A-2 in consideration of the MWG Shares and Debentures and other value provided by Eurofins to the transactions contemplated by this Agreement; (iii) Operon subscribe for twenty eight percent (28%) of the capital stock of EGBV (the "Operon EGBV Shares") for its initial capital contribution in cash to EGBV of five million dollars (US $5,000,000) to be paid immediately after Operon has received the First Tranche of Purchase Price for the sale of OBI, (iv) EVBV enter into put and call agreements pursuant to which EVBV would purchase in several steps (a) the Operon EGBV Shares for a price equal to twenty eight percent (28%) of the value of EGBV (or the actual percentage ownership by Operon of EGBV, if less), and (b) the QNA OBI Shares for an price equal to five and one-third percent of the value of EGBV and (v) EGBV make the Payment to Finance Entity (in repayment of the Pre-Closing EGBV Debt), in accordance with the terms of this Agreement, the "Note Purchase Agreement" the "Subscription Agreement", the "Operon Put and Call Agreement" and/or the "QNA Put and Call Agreement", as the case may be.

8. As conditions to Closing under this Agreement ("Closing"), the statements contained in "Background" above shall be true and correct and the following have occurred or are occurring simultaneously with, but conditioned upon, the Closing:

(a) Qiagen (and/or its relevant subsidiary or affiliate) and Operon have entered into agreements (amendment to manufacturing and supply agreement, license agreement, amended promissory note and a Consent Agreement) substantially in the forms of Exhibits I-1 through 4 (the "Qiagen Agreement"), pursuant to which, among other things: (i) Qiagen has consented to the transactions contemplated by this Agreement (the "Consent Agreement"); (ii) OBI's purchase of QSI's RNA assets has been postponed until December 31, 2008 (it being understood that this obligation has been booked as a pre-Closing liability in the Test Date financials) (the "Amendment to Manufacturing Agreement" and "License Agreement"); and (iii) Qiagen has agreed to continue its RNAi business with OBI (the "Amendment to Manufacturing Agreement" and "License Agreement").

(b) James R. Hudson, Jr., Cynthia H. Jackson, Thomas J. Howard, James R. Hudson, III and Ben Robin Howard, III (collectively "JH"), Patrick Weiss and Violette Weiss (collectively "PW"), the sole shareholders of Operon, and Operon have entered into an amendment to the Operon shareholders agreement substantially in the form of Exhibit J (the "Amended OSA"), which, among other things, provides: (i) that Patrick Weiss will be the representative of Operon with respect to EGBV; and (ii) a set of rules for Operon decision making which eliminates the possibility of a stalemate at Operon as regards EGBV.

(c) Lowe Mills Properties LLC ("Lowe Mills"), an Alabama limited liability company, and H&W Properties, LLC ("H&W"), an Alabama limited liability company, have entered into an amendment to the Master Lease Agreement, dated March 1, 2006 (the "Master Lease") and H&W and OBI have entered into an amendment to the Sublease, dated March 1, 2006 (the "Sublease") substantially in the forms of Exhibit K-1 (the "Amended OBI Lease") and Exhibit

3

K-2 (the "Amended Sublease"), respectively, which, among other things, reduces annual rent to three hundred thousand dollars (US $300,000) and warrants that (i) the facility is secure, and (ii) the entire complex conforms to fire and all other relevant building/zoning codes.

(d)  Eurofins and Operon have reached agreement regarding the calculation of Net Working Capital and Net Debt for the purpose of the Acquisitions, as shown on Exhibit L (it having been agreed that target Net Working Capital will be 10% of Net Sales; and the target Net Debt will be US$ 0).

(e)  Eurofins Finance SA, Luxembourg branch and an affiliate of Eurofins ("Finance Entity"), and EGBV have entered into a mezzanine financing agreement substantially in the form of "Mezzanine Agreement" annexed as Exhibit M, pursuant to which Finance Entity is lending (or committing to lend) to EGBV the funds necessary (approximately US$20,000,000) to enable EGBV and EGDel to conclude the transactions contemplated by this Agreement, including making the Payment, paying the Purchase Price under the North American and German Purchase Agreement and making the payments due upon the exercise of the MWG Sales Option, (the "Mezzanine Financing"), on commercial terms (comparable to those from a third party bank for finance company).The calculation of payments is annexed as Exhibit M-1 and the organizational chart as M-2.

(f) Eurofins and Operon have entered into an agreement substantially in the form of Exhibit N ("Japan Purchase Agreement") for the acquisition (the "Japan Acquisition") by Eurofins of  Phoenix and its wholly owned subsidiary, Operon Japan, effective immediately after the acquisition of Operon Germany pursuant to the "German Purchase Agreement" and immediately prior to the acquisition of OBI pursuant to the "North American Purchase Agreement".

(g) EGBV and Operon have entered into the Subscription Agreement in the form of Exhibit O pursuant to which, among other things: (i) EGBV has made representations and warranties about, and is given the valuation for, the MWG Shares and Debentures; and (ii) EGBV  is entitled to receive an additional capital contribution from Operon in the amount  fifty cents (US $.50) for every Dollar (US $1) above ten million dollars (US $10,000,000) that EVBV is contributing to EGBV as its capital contribution.

(h)  (x) EGBV and Phoenix have entered into an agreement substantially in the form of Exhibit P-1 ("German Purchase Agreement") for the acquisition ("Operon Germany Acquisition") by EGBV of  100% of the shares of capital stock of Operon Germany.

(y) EGDel and Operon have entered into an agreement substantially in the form of Exhibit P-2 ("North American Purchase Agreement" and collectively with the "German Purchase Agreement", the "North American and German Purchase Agreement" and the North American and German Purchase Agreement

collectively with the Japan Purchase Agreement, the "Subsidiary Purchase Agreements") for the acquisition (the "OBI Acquisition" and collectively with the Operon Germany Acquisition and the Japan Acquisition, the "Acquisitions") by EGDel of eighty four percent of the OBI shares (that is, the 84% of the OBI capital stock owned by Operon).

(i) EVBV and Operon and EVBV and QNA have entered into agreements substantially in the form of Exhibit Q-1 and 2 (the "Operon Put and Call Agreement" and the "QNA Put and Call Agreement", respectively, and collectively, the "Put and Call Agreement") relating to the future purchase by EVBV of (x) all of Operon's shares of EGBV, pursuant to the "Operon Put and Call Agreement" and (y) all of QNA's shares of OBI, the grant by QNA of an irrevocable proxy to EVBV to vote the QNA OBI Shares and the irrevocable assignment by QNA to EVBV of QNA's entitlement to dividends with respect to QNA's shares of OBI, pursuant to the "QNA Put and Call Agreement".

(j) Eurofins has guaranteed certain of (x) EGBV's obligations under the Subscription Agreement and the German Purchase Agreement and (y) EGDel's obligations under the North American Purchase Agreement, substantially in the form of Exhibit R (the "Eurofins Guarantee").

(k) JH and PW have guaranteed certain of Operon's obligations under the Subsidiary Purchase Agreements substantially in the form of Exhibit S-1 (the "JH / PW Guarantees") and Operon has guaranteed certain of the Seller's obligations under the Subsidiary Purchase Agreements substantially in the form of Exhibit S-2 (the "Operon Guarantee").

(l) Operon and its lender have entered into an amendment to the Operon loan agreement substantially in the form of Exhibit T (the "Operon Loan Amendment") pursuant to which, among other things, Operon's lender has (i) consented to the transactions contemplated by this Agreement, (ii) terminated any liens on or restrictions it may have or impose on or with respect to the assets of Operon or the assets and shares of OBI, Phoenix, Operon Germany or Operon Japan; and (iii) subordinated its rights to the Operon shares and their proceeds to any rights of the beneficiaries of the JH / PW Guarantees.

(m) The MWG Building (located at Anzinger Strasse 7+7a, D-85560 Ebersberg bei Munchen, Germany) has been categorized as an asset held for sale on MWG's balance sheet at the Test Date and Eurofins has guaranteed that (x) the sales price of the MWG Building will be no less than the value for it set by the accountants in MWG's balance sheet at the Test Date and (y) the annual rent to be paid by MWG with respect to the MWG Building after its sale will not exceed thirteen percent (13%) of its sales price substantially in the form of Exhibit U (the "Eurofins Building Guarantee").

(n)  Operon Japan has entered into a 3-year extension (through late December 2010) of the lease of its facilities with no changes in rent or other terms and providing for electricity to be supplied to all floors at no cost to Operon Japan, substantially in the form of <u>Exhibit V</u> (the "<u>Japan Lease Amendment</u>").

(o)  Operon Japan has segregated the assets and liabilities related to Air China and has obtained the Air China Guarantee substantially in the form of <u>Exhibit W</u>.

(p)  EGBV shall have the MWG Sales Option, substantially in the form of <u>Exhibit X</u> and shall have the consent to the exercise of the MWG Sale Option by EGBV from MWG management.

(r)  OBI has made the Assets Carve Out, substantially in the form of <u>Exhibit Y;</u>

(s)  The flow of funds for the First Tranche of Purchase Price with respect to the agreements and transactions referred to in this Agreement shall occur in accordance with the Flow of Funds memorandum annexed as <u>Exhibit Z</u> (the "<u>Flow of Funds</u>"),

(t)  recognizing that there will be a delay between the execution of the documents and the Closing, in order to allow for the First Tranche of Purchase Price to be received by the respective Operon Sellers and for Operon to make its Investment in EGBV, the parties also will enter into an escrow agreement substantially in the form of <u>Exhibit aa (the "Escrow Agreement</u>"), and

(u)  Such other events as are listed in any of the documents referred to in this Agreement as conditions to closing under such documents.

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants hereinafter set forth and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

## ARTICLE 1

## CAPITAL CONTRIBUTIONS

SECTION 1.01 <u>Capital Contribution by Operon; Execution of the Subscription Agreement and the Shareholders Agreement; Adjustments; Payment to Finance Entity and Investment by Eurofins and by Operon.</u>

(a)  (i) On the terms and subject to the conditions of this Agreement:  (A) Operon is subscribing for the Operon EGBV Shares in consideration for Five Million Dollars (USD 5,000,000) (at a Euro to US Dollar conversion rate of 1: 1.4179) ("<u>Operon's Investment</u>") which Operon agrees tocontribute and deliver to EGBV, in accordance with paragraph 7 of "Background" above and the Flow of Funds, (B-1)

Eurofins agrees to contribute and deliver to EGBV the value of Ten Million Thousand Dollars (USD 10,000,000), in accordance with paragraph 7 of "Background" above and the Flow of Funds, and (B-2) EGBV agrees to contribute and deliver to EGDel the amount necessary to pay the Purchase Price for OBI in two tranches, in accordance with paragraph 7 of "Background" above and the Flow of Funds, (C) Eurofins, Operon and EGBV are entering into the "Shareholders Agreement", (D) Operon and EGBV are entering into the "Subscription Agreement", (E) EGDel agrees to make the "First Tranche Of Purchase Price" and the "Second Tranche of Purchase Price" pursuant to the North American Purchase Agreement (with funds provided by EGBV), and (F) Eurofins agrees to make the "First Tranche of Purchase Price" and the "Second Tranche of Purchase Price" pursuant to the Japan Purchase Agreement. EGBV agrees to make the "First Tranche of Purchase Price" and the "Second Tranche of Purchase Price" pursuant to the German Purchase Agreement.

(ii) With respect to all of the transactions contemplated by this Agreement, unless specifically stated otherwise in the relevant Subsidiary Purchase Agreement, the value in US Dollars of foreign currency (A) at Closing and at the "Test Date" (as defined in the "Subsidiary Purchase Agreements") shall be determined using the applicable exchange rate on the "Test Date", which, in the case of the Euro/USD exchange rate, will be taken from the European Zentralbank on the 28th of September 2007 and will be 1 Euro to 1.4179 USD and in the case of USD/Yen exchange rate, will be taken from the Bank of Japan on the 28th of September 2007 and will be 115.05 Yen to 1 USD and (B) thereafter, shall be the exchange rates used for the balance sheet in the financial statements from which such value is being calculated.

(b) (i) In the event that any amount due from or with respect to Eurofins under this Agreement or any agreement referred to herein is not paid in full when due ("Unpaid EG Amount"), the Unpaid EG Amount shall be deemed to have been paid by Eurofins from of its investment in EGBV, thereby reducing dollar for dollar Eurofins investment in EGBV and entitling Operon, effective the Closing, to purchase for no consideration the number of shares of EGBV held by Eurofins having a combined value (at the per share value of EGBV shares at Closing) equal to the Unpaid EG Amount.

(ii) In the event that any amount due from or with respect to Operon under this Agreement or any agreement referred to herein is not paid in full when due ("Unpaid Operon Amount"), the Unpaid Operon Amount shall be deemed to have been paid from Operon's Investment, thereby reducing Operon's Investment dollar for dollar and entitling EVBV, effective the Closing, to purchase for no consideration the number of shares of EGBV issued to Operon having a combined value (at the per share value of EGBV shares at Closing) equal to the Unpaid Operon Amount.

(c) In the unlikely event that the formula being used to calculate Eurofins' contribution to EGBV results in Eurofins contributing more than Ten Million Dollars (US $10,000,000), Operon shall be required to promptly increase the Operon Investment by an amount equal to fifty percent (50%) of the amount by which Eurofins' contribution exceeds Ten Million Dollars (US $10,000,000).

SECTION 1.02 <u>Closing</u>. Upon the terms and subject to the conditions of this Agreement and the Escrow Agreement, this Agreement and the agreements referred to herein (together with the deliveries required hereby and thereby other than payments) are being executed and delivered in escrow on the date hereof, the payments required by this Agreement and the agreements referred to herein will be made commencing seven days after signing in accordance with the Flow of Funds and the "<u>Closing</u>" of this Agreement and of the agreements referred to herein shall occur  as and when the party entitled to receive funds with respect thereto shall have received such fund, it being understood and agreed that the parties will instruct their banks to notify both the remitter and the recipient of funds promptly upon receipt thereof   ("<u>Closing Date</u>").

SECTION 1.03 <u>Deliveries by Eurofins</u>. Eurofins is delivering or causing to be delivered the following in escrow for release to EGBV:

(a) the Mezzanine Financing Agreement executed by Eurofins Finance S.A.,  it being understood and agreed that Finance Entity will perform its obligations at Closing under the Mezzanine Financing Agreement;

(b) the Shareholders Agreement, executed by Eurofins;

(c) the Japan Acquisition Agreement, executed by Eurofins, it being understood and agreed that Eurofins will perform its obligations at Closing under the Japan Acquisition Agreement;

(d) the Eurofins Guarantee and the Eurofins Building Guarantee, executed by Eurofins;

(e) OMITTED ;

(f) the Subscription Agreement, executed by EGBV, it being understood and agreed that EGBV (and/or its relevant subsidiary or affiliates) will perform its obligations at Closing under the Subscription Agreement;

(g) the MWG Sales Option, executed by Medigenomics,

(h) the North American Purchase Agreement, executed by EGDel, it being understood and agreed that EGDel will perform its obligations at Closing under the North American Purchase Agreement;

(i) the German Purchase Agreement, executed by EGBV, it being understood and agreed that EGBV will perform its obligations at Closing under the German Purchase Agreement;

(j) the Put and Call Agreement, executed by Eurofins; and

(k) such other documents, instruments and certificates required from Eurofins, EGBV or their affiliates by this Agreement.

8

SECTION 1.04A <u>Deliveries by Operon</u>. Operon is delivering or causing to be delivered the following in escrow for release to EGBV and is performing:

(a) the Subscription Agreement, executed by Operon, it being understood and agreed that Operon will remit Operon's Investment at Closing;

(b) the Qiagen Agreement, executed by Qiagen and Operon, and performance by Qiagen (and/or its relevant subsidiary or affiliates) and Operon of their obligations at closing under the Qiagen Agreement;

(c) the Amended OSA, executed by JH, PW and Operon;

(d) the Japan Acquisition Agreement, executed by Operon and OBI, and performance by Operon and OBI of their respective obligations at Closing under the Japan Acquisition Agreement;

(e) the North American Purchase Agreement, executed by Operon, with all of Operon's obligations at Closing thereunder performed by Operon;

(f) the JH/PW Guarantees, executed by JH and PW;

(g) the Amended OBI Lease, executed by Lowe Mills, H&W and OBI,

(h) the Operon Loan Amendment, executed by Operon's lender and Operon,

(i) the fully executed Japan Lease Amendment or unconditional right to the Japan Lease Amendment;

(j) the fully executed Air China Guarantee;

(k) the fully executed Assets Carve Out;

(l) the Operon Put and Call Agreement, executed by Operon;

(m) the German Purchase Agreement, executed by Operon, OBI and Phoenix with all of Operon's, OBI's and Phoenix's obligations at Closing thereunder performed by Operon, OBI and Phoenix, respectively; and

(m) such other documents, instruments and certificates required from Operon, OBI, JH, PW or their affiliates by this Agreement.

SECTION 1.04B <u>Closing Deliveries by QNA</u>. QNA is delivering or causing to be delivered the following in escrow for release to EGBV and is performing:

(a) the Qiagen Agreement, executed by Qiagen, and performance by Qiagen (and/or its relevant subsidiary or affiliates) of their obligations at Closing under the Qiagen Agreement;

9

(b) the QNA Put and Call Agreement, executed by QNA; and

(c) such other documents, instruments and certificates required from Qiagen, QNA, or their affiliates by this Agreement.

SECTION 1.05 <u>Further Assurances</u>. At any time and from time to time after the Closing Date, each of the parties hereto, at the request of any other party hereto and without further consideration, will execute and deliver such other instruments of sale, transfer, conveyance, assignment, confirmation and other instruments as may be reasonably requested in order to more effectively to effectuate the transactions contemplated herein.

ARTICLE II REPRESENTATIONS AND WARRANTIES OF EUROFINS

As an inducement to the parties to enter into this Agreement and to consummate the transactions contemplated hereby, Eurofins represents to Operon and QNA as follows:

SECTION 2.01 <u>Organization; Qualification</u>. Eurofins, EGBV, EGDel and Finance Entity (collectively, the "<u>Eurofins Companies</u>" and individually, a "<u>Eurofins Company</u>") are corporations duly organized, validly existing and in good standing under the laws of their respective jurisdictions of formation. Each of the Eurofins Companies is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary or desirable, except where the failure to so qualify would not reasonably be expected to have a material adverse effect on the business, operations, assets, properties or condition, financial or otherwise, of such Eurofins Company.

SECTION 2.02 <u>Authority to Execute and Perform Agreement</u>. Each of the Eurofins Companies has the corporate power and authority to execute, deliver and perform this Agreement and the other agreements, documents and instruments contemplated hereby to which it is a party (collectively, the "<u>Eurofins Agreements</u>" and individually, a "<u>Eurofins Agreement</u>"). The execution, delivery and performance of the Eurofins Agreements by each Eurofins Company and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite actions on the part of such Eurofins Company. This Agreement, and each of the other Eurofins Agreements have been or will be duly executed and delivered by, and constitute or will constitute the valid and binding obligation of such Eurofins Company enforceable against such Eurofins Company in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

SECTION 2.03 <u>Power and Authority</u>. Each of the Eurofins Companies has all of the necessary power and authority to own, operate or lease its assets and to conduct its business.

SECTION 2.04 <u>No Conflict</u>. Neither the execution and delivery of this Agreement and the other Eurofins Agreements, the consummation of the transactions contemplated hereby or thereby, nor the performance of this Agreement and such other Eurofins Agreements in compliance with the terms and conditions hereof and thereof will (i) violate, conflict with or result in any breach of the charter or by-laws of the relevant Eurofins Company or any judgment, decree, order, statute or regulation applicable to such Eurofins Company, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority of such Eurofins Company, (iii) violate, conflict with or result in a breach, default or termination or give rise to any right of termination, cancellation or acceleration of the maturity of any payment date of any of the obligations of such Eurofins Company or increase or otherwise affect the obligations of such Eurofins Company under any law, rule, regulation or any judgment, decree, order, governmental permit, license or order or any of the terms, conditions or provisions of any mortgage, indenture, note, license, agreement or other instrument or obligation related to such Eurofins Company or to the ability of Eurofins to consummate the transactions contemplated hereby or by such Eurofins Company thereby, or (iv) result in the creation of any claim upon such Eurofins Company.

SECTION 2.05 <u>Governmental Approvals</u>. Except as set forth on <u>Schedule 2.05</u>, no registration or filing with, or consent or approval of or other action by, any "<u>Governmental Authority</u>" is or will be necessary for the valid execution, delivery and performance by the relevant Eurofins Company of this Agreement and the other Eurofins Agreements. "Governmental Authority" means any public body, governmental, administrative or regulatory authority, agency, instrumentality or commission, including courts of competent jurisdiction and arbitral tribunals, whether French, European, Japanese, U.S. federal, U.S. state, local or foreign.

SECTION 2.06 <u>No Broker or Finder</u>. No broker, finder or other financial consultant has acted on behalf of any Eurofins Company in connection with this Agreement, the other Eurofins Agreements or the transactions contemplated hereby or thereby in such a way as to create any liability on EGBV. Eurofins agrees to indemnify and save the other harmless from any claim or demand for commission or other compensation by any broker, finder, financial consultant or similar agent claiming to have been employed by or on behalf of any Eurofins Company and to bear the cost of legal expenses incurred in defending against any such claim.

SECTION 2.07 <u>Disclosure</u>. All documents and schedules delivered or to be delivered by or on behalf of any Eurofins Company in connection with this Agreement, the other Eurofins Agreements and the transactions contemplated hereby are true, complete and correct.

SECTION 2.08 <u>Consents</u>. Except as set forth on <u>Schedule 2.08</u>, no Eurofins Company is required to give any notice or to obtain any consent from any person in connection with the execution and delivery of this Agreement, the other Eurofins Agreements or the consummation or performance of any of the transactions contemplated hereby or thereby.

11

SECTION 2.09 <u>No</u> Distributions.  There have been no dividends or distributions of profits, cash, assets or the like to, or stock repurchases or the like from, the shareholders since the Test Date nor is there an effective board or shareholder resolution relating to the dividend, distribution or other transfer of funds to current or past shareholders of the Company.

ARTICLE IIIA REPRESENTATIONS AND WARRANTIES OF OPERON

Operon hereby represents and warrants to Eurofins and QNA that:

SECTION 3.01A <u>Organization; Qualification</u>. Operon, OBI, Phoenix, Operon Germany and Operon Japan (collectively, the "<u>Operon Companies</u>" and individually, a "<u>Operon Company</u>") are corporations duly organized, validly existing and in good standing under the laws of their respective jurisdictions of formation. Each of the Operon Companies is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary or desirable, except where the failure to so qualify would not reasonably be expected to have a material adverse effect on the business, operations, assets, properties or condition, financial or otherwise, of such Operon Company.

SECTION 3.02A <u>Authority to Execute and Perform Agreement</u>. Each of the Operon Companies has the corporate power and authority to execute, deliver and perform this Agreement and the other agreements, documents and instruments contemplated hereby to which it is a party (collectively, the "<u>Operon Agreements</u>" and individually, a "<u>Operon Agreement</u>"). The execution, delivery and performance of this Agreement and the other Operon Agreements by each Operon Company and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite actions on the part of such Operon Company. This Agreement, and each of the other Operon Agreements have been or will be duly executed and delivered by, and constitute or will constitute the valid and binding obligation of such Operon Company enforceable against such Operon Company in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

SECTION 3.03A <u>Power and Authority</u>. Each Operon Company has all of the necessary power and authority to own, operate or lease its assets and to conduct its business.

SECTION 3.04A <u>No Conflict</u>. Neither the execution and delivery of this Agreement and the other Operon Agreements, the consummation of the transactions contemplated hereby or thereby, nor the performance of this Agreement and such other Operon Agreements in compliance with the terms and conditions hereof and thereof will (i) violate, conflict with or result in any breach of the charter or by-laws of the relevant Operon Company or any judgment, decree, order, statute or regulation applicable to such Operon Company, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority of such Operon

12

Company, (iii) violate, conflict with or result in a breach, default or termination or give rise to any right of termination, cancellation or acceleration of the maturity of any payment date of any of the obligations of such Operon Company or increase or otherwise affect the obligations of such Operon Company under any law, rule, regulation or any judgment, decree, order, governmental permit, license or order or any of the terms, conditions or provisions of any mortgage, indenture, note, license, agreement or other instrument or obligation related to such Operon Company or to the ability of Operon to consummate the transactions contemplated hereby or by such Operon Company thereby, or (iv) result in the creation of any claim upon such Operon Company or EGBV.

SECTION 3.05A <u>Governmental Approvals</u>. Except as set forth on <u>Schedule 3.05A</u>, no registration or filing with, or consent or approval of or other action by, any Governmental Authority is or will be necessary for the valid execution, delivery and performance by the relevant Operon Company of this Agreement and the other Operon Agreements.

SECTION 3.06A <u>No Broker or Finder</u>. Except as set forth on <u>Schedule 3.06A</u>, no broker, finder or other financial consultant has acted on behalf of any Operon Company in connection with this Agreement, the other Operon Agreements or the transactions contemplated hereby or thereby in such a way as to create any liability on EGBV. Operon agrees to indemnify and save the other harmless from any claim or demand for commission or other compensation by any broker, finder, financial consultant or similar agent claiming to have been employed by or on behalf of any Operon Company and to bear the cost of legal expenses incurred in defending against any such claim.

SECTION 3.07A <u>Disclosure</u>. All documents and schedules delivered or to be delivered by or on behalf of any Operon Company in connection with this Agreement, the other Operon Agreements and the transactions contemplated hereby and thereby are true, complete and correct.

SECTION 3.08A <u>Consents</u>. Except as set forth on <u>Schedule 3.08A</u>, no Operon Company is required to give any notice or to obtain any consent from any person in connection with the execution and delivery of this Agreement, the other Operon Agreements or the consummation or performance of any of the transactions contemplated hereby or thereby.

SECTION 3.09 <u>No</u> Distributions. There <u>have been</u> no dividends, distributions of profits, cash, assets or the like to, or stock repurchases or the like from, the shareholders since the Test Date, nor is there any effective board or shareholder resolution effective relating to the dividend, distribution, or other transfer of funds to current or past shareholders of Operon other than the assets held for sale at the Test Date that were sold for their value at Test Date to Operon and the OBI I/C Loan to Operon that should be paid back at the latest after the Second Tranche of Purchase Price has been paid.

ARTICLE IIIB REPRESENTATIONS AND WARRANTIES OF QNA

QNA hereby represents and warrants to Eurofins and Operon that:

SECTION 3.01B <u>Organization; Qualification</u>. Qiagen, QNA and QSI (collectively, the "<u>Qiagen Companies</u>" and individually, a "<u>Qiagen Company</u>") are corporations duly organized, validly existing and in good standing under the laws of their respective jurisdictions of formation. Each of the Qiagen Companies is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary or desirable, except where the failure to so qualify would not reasonably be expected to have a material adverse effect on the business, operations, assets, properties or condition, financial or otherwise, of such Qiagen Company.

SECTION 3.02B <u>Authority to Execute and Perform Agreement</u>. Each of the Qiagen Companies has the corporate power and authority to execute, deliver and perform this Agreement and the other agreements, documents and instruments contemplated hereby to which it is a party (collectively, the "<u>Qiagen Contracts</u>" and individually, a "<u>Qiagen Contract</u>"). The execution, delivery and performance of this Agreement and the other Qiagen Contracts by each Qiagen Company and the consummation of the transactions contemplated hereby and thereby have been duly authorized and approved by all requisite actions on the part of such Qiagen Company. This Agreement, and each of the other Qiagen Contracts have been or will be duly executed and delivered by, and constitute or will constitute the valid and binding obligation of such Qiagen Company enforceable against such Qiagen Company in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

SECTION 3.03B <u>Power and Authority</u>. Each Qiagen Company has all of the necessary power and authority to own, operate or lease its assets and to conduct its business.

SECTION 3.04B <u>No Conflict</u>. Neither the execution and delivery of this Agreement and the other Qiagen Contracts, the consummation of the transactions contemplated hereby or thereby, nor the performance of this Agreement and such other Qiagen Contracts in compliance with the terms and conditions hereof and thereof will (i) violate, conflict with or result in any breach of the charter or by-laws of the relevant Qiagen Company or any judgment, decree, order, statute or regulation applicable to such Qiagen Company, (ii) require any consent, approval, authorization or permit of, or filing with or notification to, any governmental or regulatory authority of such Qiagen Company, (iii) violate, conflict with or result in a breach, default or termination or give rise to any right of termination, cancellation or acceleration of the maturity of any payment date of any of the obligations of such Qiagen Company or increase or otherwise affect the obligations of such Operon Company under any law, rule, regulation or any judgment, decree, order, governmental permit, license or order or any of the terms, conditions or provisions of any mortgage, indenture, note, license, agreement or other instrument or obligation related to such Operon Company or to the ability of Operon to consummate the transactions contemplated hereby or by such Operon Company thereby, or (iv) result in the creation of any claim upon such Operon Company or EGBV.

14

SECTION 3.05B <u>Governmental Approvals</u>. Except as set forth on <u>Schedule 3.05B</u>, no registration or filing with, or consent or approval of or other action by, any Governmental Authority is or will be necessary for the valid execution, delivery and performance by the relevant Qiagen Company of this Agreement and the other Qiagen Contracts.

SECTION 3.06B <u>No Broker or Finder</u>. No broker, finder or other financial consultant has acted on behalf of any Qiagen Company in connection with this Agreement, the other Qiagen Contracts or the transactions contemplated hereby or thereby in such a way as to create any liability on EGBV. QNA agrees to indemnify and save the other harmless from any claim or demand for commission or other compensation by any broker, finder, financial consultant or similar agent claiming to have been employed by or on behalf of any Qiagen Company and to bear the cost of legal expenses incurred in defending against any such claim.

SECTION 3.07B <u>Disclosure</u>. All documents and schedules delivered or to be delivered by or on behalf of any Qiagen Company in connection with this Agreement, the other Qiagen Contracts and the transactions contemplated hereby and thereby are true, complete and correct.

SECTION 3.08B <u>Consents</u>. Except as set forth on <u>Schedule 3.08B</u>, no Qiagen Company is required to give any notice or to obtain any consent from any person in connection with the execution and delivery of this Agreement, the other Qiagen Contracts or the consummation or performance of any of the transactions contemplated hereby or thereby.

ARTICLE IV COVENANTS OF EUROFINS, OPERON AND QNA

Each of Eurofins, Operon and QNA covenant and agree with each other, as follows:

SECTION 4.01 <u>Best Efforts Cooperation</u>. Each of Eurofins, Operon and QNA shall use its best efforts to perform and fulfill or cause to be performed and fulfilled all conditions and obligations to be fulfilled or performed by it or the other Eurofins Companies, Operon Companies or Qiagen Companies, as the case may be, hereunder, to the end that the transactions contemplated hereby and by the other Eurofins Agreements, Operon Agreements or Qiagen Contracts, as the case may be, will be fully and timely consummated. By way of non-exclusive example, EGBV and Operon agree to instruct their bankers to give prompt joint notice to EGBV and to Operon of the remittance and the receipt of funds contemplated by the Flow of Funds.

SECTION 4.02 <u>Confidentiality</u>. Eurofins, Operon and QNA agree not to divulge, communicate or disclose and to cause the other Eurofins Companies, Operon Companies or Qiagen Companies, as the case may be to not divulge, communicate or disclose, except as may be agreed or required by law or for the performance of this Agreement, the other Eurofins Agreements, Operon Agreements and Qiagen Contracts, as the case may be, and the transactions contemplated hereby and thereby.

15

SECTION 4.03 <u>Publicity</u>. No Eurofins Company, Operon Company or Qiagen Company shall issue any press release or otherwise make any public statement with respect to the execution of, or the transactions contemplated by, this Agreement or the other Eurofins Agreements, Operon Agreements or Qiagen Contracts, as the case may be, without the prior written consent of the other parties which consent shall not be unreasonably withheld or delayed, except that any party shall be entitled to make, without the agreement of the other parties (but following notice to the other parties) such disclosures to the public or to governmental authorities as each such party's counsel deems reasonably necessary to maintain compliance with applicable laws.

SECTION 4.04 <u>Compensation To Employees And Others</u>. No Eurofins Company, Operon Company or Qiagen Company nor any of their respective Affiliates, officers, directors, equity owners, agents or any other person acting on their behalf, has prior to the date hereof, directly or indirectly, given or agreed to give or will from and after the date hereof, directly or indirectly, give or agree to give, any money, gift or similar benefit (including compensation in any form or the promise of compensation in any form based upon the closing of any of the transactions contemplated by this Agreement and/or the results of EGBV or any of its subsidiaries or Affiliates) to any employee, agent or consultant of/to another party to this Agreement which has not been approved in advance by such other party and approved by the EBGV shareholders either by written consent or at a shareholders meeting.

ARTICLE V INDEMNIFICATION

SECTION 5.01 <u>Indemnification by Eurofins</u>. Eurofins agrees, jointly and severally with any relevant Eurofins Company, to indemnify, defend and hold harmless Operon, the other Operon Companies, QNA and the other Qiagen Companies and the respective officers, directors, employees and shareholders of the foregoing, and their successors and assigns from, against and with respect to any and all claims, liabilities, obligations, losses, damages, assessments, judgments, costs and expenses (including, without limitation, reasonable attorneys' and accountants' fees and costs and expenses reasonably incurred in investigating, preparing, defending against or prosecuting any litigation or claim, action, suit, proceeding or demand) of any kind or character (hereinafter collectively referred to as "<u>Damages</u>") arising out of or in any manner incident, relating or attributable to:

(a) Any inaccuracy in any representation or breach of warranty of any Eurofins contained in this Agreement, or by any Eurofins Company in any other Eurofins Agreement or in any certificate, instrument of transfer or other document or agreement of any Eurofins Company in connection with this Agreement, any other Eurofins Agreement or otherwise made or given in connection with this Agreement or any other Eurofins Agreement; and

(b) Any failure by any Eurofins Company to perform or observe, or to have performed or observed, in full, any material covenant, agreement or condition to be performed or observed by it under this Agreement, any other Eurofins Agreement or

under any certificates or other documents or agreements executed by such Eurofins Company in connection with this Agreement or any other Eurofins Agreement.

SECTION 5.02A Indemnification by Operon. Operon agrees, jointly and severally with any relevant Operon Company, to indemnify, defend and hold harmless Eurofins, the other Eurofins Companies, QNA and the other Qiagen Companies and their respective officers, directors, employees and shareholders and their successors and assigns from, against and with respect to any and all Damages arising out of or in any manner incident, relating or attributable to:

(a) Subject to Section 5.02 (c) below, any inaccuracy in any representation or breach of warranty of Operon contained in this Agreement, or by any Operon Company in any other Operon Agreement or in any certificate, instrument of transfer or other document or agreement of any Operon Company in connection with this Agreement, any other Operon Agreement or otherwise made or given in connection with this Agreement or any other Operon Agreement; and

(b) Subject to Section 5.02 (c) below, any failure by any Operon Company to perform or observe, or to have performed or observed, in full, any material covenant, agreement or condition to be performed or observed by it under this Agreement, any other Operon Agreement or under any certificates or other documents or agreements executed by such Operon Company in connection with this Agreement or any other Operon Agreement.

(c) For the purpose of clarification, the parties hereto acknowledge and agree that the indemnification pursuant to Section 5.02(a) and (b) above shall not apply to the Amendment to Manufacturing Agreement and the License Agreement under which indemnification will be limited to the respective contract parties only.


SECTION 5.02B Indemnification by QNA. QNA agrees, jointly and severally with any relevant Qiagen Company, to indemnify, defend and hold harmless Eurofins, the other Eurofins Companies, Operon and the other Operon Companies and their respective officers, directors, employees and shareholders and their successors and assigns from, against and with respect to any and all Damages arising out of or in any manner incident, relating or attributable to:

(a) Any inaccuracy in any representation or breach of warranty of QNA contained in this Agreement, or by any Qiagen Company in any other Qiagen Contract or in any certificate, instrument of transfer or other document or agreement of any Qiagen Company in connection with this Agreement, any other Qiagen Contract or otherwise made or given in connection with this Agreement or any other Qiagen Contract; and

(b) Any failure by any Qiagen Company to perform or observe, or to have performed or observed, in full, any material covenant, agreement or condition to be performed or observed by it under this Agreement, any other Qiagen Contract or under

17

any certificates or other documents or agreements executed by such Qiagen Company in connection with this Agreement or any other Qiagen Contract.

SECTION 5.03 <u>Claims for Indemnification</u>. In the event of the occurrence of any event which any party asserts is an indemnifiable event pursuant to this <u>Article V</u>, the party claiming indemnification (the "<u>Indemnified Party</u>") shall provide prompt notice to the party required to provide indemnification (the "<u>Indemnifying Party</u>"), specifying in detail the facts and circumstances with respect to such claim and the basis for which indemnification is available hereunder, provided, however, that the failure to provide such notice shall only release the applicable Indemnifying Party from any of its obligations under this <u>Article V</u> to the extent such Indemnifying Party is prejudiced by such failure. If such event involves the claim of any third party, and if the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party hereunder against any Damages that may result from such third party claim, the Indemnifying Party shall have the right to control the defense or settlement of such claim; provided, however, that (a) the Indemnified Party shall be entitled to participate in the defense of such claim at its own expense, (b) the Indemnifying Party shall obtain the prior written approval of the Indemnified Party (which approval shall not be unreasonably withheld or delayed) before entering into any settlement of such claim if, pursuant to or as a result of such settlement, injunctive or other non-monetary relief Indemnifying Party shall not be entitled to control (but shall be entitled to participate at its own expense in the defense of), and the Indemnified Party shall be entitled to have sole control over, and shall assume all expense with respect to the defense or settlement of any claim to the extent such claim seeks an order, injunction or other equitable relief against the Indemnified Party which, if successful, could materially interfere with the business, operations, assets, condition (financial or otherwise) or prospects of the Indemnified Party, provided that the Indemnified Party shall provide written notice to the Indemnifying Party of its election to assume control over the defense of such claim pursuant to this <u>Section 5.03(c)</u>, (d) if there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate in the reasonable judgment of the Indemnified Party for the same counsel to represent both the Indemnified Party and the Indemnifying Party, then the Indemnified Party shall be entitled to retain its own counsel, in each jurisdiction for which the Indemnified Party determines counsel is required, at the expense of the Indemnifying Party; provided, however, that in no event shall the Indemnifying Party be liable for the expenses of more than one counsel in addition to local counsel and (e) if the Indemnifying Party is entitled but fails to assume control over the defense of a claim as provided in this <u>Section 5.03</u>, provided that the Damages associated with such claim are covered by the indemnity provisions of <u>Sections 5.01</u>, or <u>5.02</u>, the Indemnified Party shall have the right to defend such claim, provided, further, that the Indemnified Party shall obtain the prior written approval of the Indemnifying Party (which approval shall not be unreasonably withheld or delayed) before entering into any settlement of such claim if, pursuant to or as a result of such settlement, injunctive or other non-monetary relief would be imposed against the Indemnifying Party.

In the event that the Indemnifying Party shall be obligated to indemnify the Indemnified Party in an action solely for Damages pursuant to this <u>Article V</u>, the Indemnifying Party shall, upon payment of such indemnity in full, be subrogated to all

18

rights of the Indemnified Party with respect to the claim to which such indemnification relates.

SECTION 5.04 <u>Limits on Indemnification</u>. Notwithstanding anything set forth in this Agreement, in no event shall (a) Eurofins or Operon be liable for more than Five Million Dollars (US $5,000,000) each pursuant to this Agreement, it being understood and agreed that such limitation shall not be applicable to their respective obligations under <u>Section 1.01(a)(i)(A) and (B-1)</u> above and such parties and/or their respective subsidiaries or affiliates have separate and independent indemnification obligations with respect to the other agreements and transactions referred to in this Agreement, and (b) QNA be liable for more than One Million Dollars (US $1,000,000) pursuant to this Agreement, it being understood and agreed that QNA and/or its subsidiaries or affiliates may have separate and independent indemnification obligations with respect to the other agreements and transactions referred to in this Agreement. In no event shall any Indemnifying Party hereunder have any liability under this Agreement for Damages unless and until such claim for Damages hereunder in the aggregate exceeds Twenty Five Thousand Dollars (US$25,000), at which time the Indemnified Party shall be entitled to claim the full amount of all Damages. Notwithstanding anything to the contrary contained herein, there shall be no limit on Damages or other amounts payable to any party resulting from acts of fraud by any other party. In addition, the amount of any Damages from and against which any party is liable to indemnify the others under this <u>Article V</u> shall be reduced by any insurance or other recoveries (offset by the amount of any increased premiums attributable to, and reasonably likely to result from, the payment of such recoveries) or any Tax benefit that the Indemnified Party may realize as a result of or in connection with such Damages.

SECTION 5.05 <u>Survival</u>. Except as expressly stated otherwise in the relevant agreement, all representations and warranties in this Agreement, all other Eurofins Agreements, Operon Agreements and Qiagen Contracts or in any instrument or document furnished in connection with this Agreement, any other Eurofins Agreement, Operon Agreement or Qiagen Contract or the transactions contemplated hereby or thereby, shall survive the closing of the transactions contemplated hereby and any investigation at any time made by or on behalf of any party and continue until twenty-four (24) months from the Closing Date (the "<u>Expiration Date</u>"), except that representations and warranties with respect to which a claim is asserted in writing prior to the Expiration Date shall survive until finally resolved and satisfied in full. All covenants and agreements contained herein shall survive until fully performed in accordance with their terms.

SECTION 5.06 <u>Exclusivity</u>. The remedies provided by this <u>Article IV</u> shall be the sole and exclusive remedy for the parties to this Agreement with respect to any dispute arising from or related to this Agreement.

## ARTICLE VI MISCELLANEOUS

SECTION 5.01 <u>Notices</u>. All notices, requests, consents and other communications hereunder shall be in writing, shall be addressed to the receiving party's address set forth

below or to such other address as a party may designate by notice hereunder, and shall be either (i) delivered by hand, (ii) made by telecopy or facsimile transmission, (iii) sent by recognized overnight courier, or (iv) sent by registered or certified mail, return receipt requested, postage prepaid.

If to Eurofins :  Eurofins Venturers BV
Bergschot 71, 4817 PA Breda
Attention: Geradus Blom

with a copy to:  Jonathan B. Lapin, Esq.
575 Madison Avenue, Floor 25
New York, NY 10022
Telephone: +1 212 751 7528

If to Operon:  Patrick Weiss
c/o Richard Marsden, Esq.
Lanier Ford Shaver & Payne PC
200 Westside Square, Suite 5000
Huntsville, Alabama 35801
Telephone:  +1 256 535 1100

with a copy to:  Richard Marsden, Esq.
Lanier Ford Shaver & Payne PC
200 Westside Square, Suite 5000
Huntsville, Alabama 35801
Telephone:  +1 256 535 1100

If to QNA:  Qiagen North American Holdings, Inc.
19300 Germantown Road
Germantown, MD 20874
Attention:  CFO

with a copy to:  QIAGEN GmbH
QIAGEN Strasse 1
40724 Hilden
Attention:  Dr. Philipp von Hugo
Telephone:  +49 2103 2911844

All notices, requests, consents and other communications hereunder shall be deemed to have been received either (i) if by hand, at the time of the delivery thereof to the receiving party at the address of such party set forth above, (ii) if made by telecopy or facsimile transmission, at the time that receipt thereof has been acknowledged by electronic confirmation or otherwise if such time is during a business day, and, if not, on the next succeeding business day, (iii) if sent by overnight courier, on the next business day following the day such notice is delivered to the courier service, or (iv) if sent by

20

registered or certified mail, at the time of the delivery thereof to the receiving party at the address of such party set forth above.

SECTION 6.02 <u>Entire Agreement</u>. This Agreement together with the Exhibits and Schedules hereto and the other documents executed in connection herewith (together, the "<u>Documents</u>") embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior oral or written agreements and understandings relating to the subject matter hereof. No statement, representation, warranty, covenant or agreement of any kind not expressly set forth in the Documents shall affect, or be used to interpret, change or restrict, the express terms and provisions of this Agreement. Attached to this is Agreement as "<u>Exhibit bb</u>" is a series of <u>diagrams summarizing</u> the facts and transactions referred to in this Agreement.

SECTION 6.03 <u>Modifications and Amendments</u>. The terms and provisions of this Agreement may be modified or amended only by written agreement executed by all parties hereto.

SECTION 6.04 <u>Waivers and Consents</u>. No failure or delay by a party hereto in exercising any right, power or remedy under this Agreement, and no course of dealing between the parties hereto, shall operate as a waiver of any such right, power or remedy of the party. No single or partial exercise of any right, power or remedy under this Agreement by a party hereto, nor any abandonment or discontinuance of steps to enforce any such right, power or remedy, shall preclude such party from any other or further exercise thereof or the exercise of any other right, power or remedy hereunder. Subject to <u>Section 4.06</u> hereof, the election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies. No notice to or demand on a party not expressly required under this Agreement shall entitle the party receiving such notice or demand to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the party giving such notice or demand to any other or further action in any circumstances without such notice or demand. The terms and provisions of this Agreement may be waived, or consent for the departure therefrom granted, only by written document executed by the party entitled to the benefits of such terms or provisions. No such waiver or consent shall be deemed to be or shall constitute a waiver or consent with respect to any other terms or provisions of this Agreement, whether or not similar. Each such waiver or consent shall be effective only in the specific instance and for the purpose for which it was given, and shall not constitute a continuing waiver or consent.

SECTION 6.05 <u>Assignment</u>. Neither this Agreement, nor any right hereunder, may be assigned by any of the parties hereto except by operation of law without the prior written consent of the other party.

SECTION 6.06 <u>Parties in Interest</u>. This Agreement shall be binding upon and inure solely to the benefit of each party hereto and their permitted assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other person any rights or remedies of any nature whatsoever under or by reason of this Agreement. Nothing in this Agreement shall be construed to create any rights or obligations except

among the parties hereto, and no person or entity shall be regarded as a third-party beneficiary of this Agreement.

SECTION 6.07 <u>Dispute Resolution</u>. Any dispute arising out of or relating to this Agreement or any other agreement among the parties referred to herein, including but not limited to, claims for indemnification, shall be resolved in accordance with the procedures specified in this <u>Section 6.07</u>, which shall be the sole and exclusive procedure for the resolution of any such disputes.

(a) <u>Negotiation Between Parties</u>.

(i) The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between Eurofins, Operon and QNA. Any party may give the other party written notice of any dispute not resolved in the normal course of business. Within fifteen (15) days after delivery of the notice, the receiving party shall submit to the other a written response. The notice and response shall include (a) a statement of each party's position and a summary of arguments supporting that position, and (b) the name and title of the party who will represent that party and of any other person who will accompany the person at a meeting held for the purpose of attempting to resolve the dispute. Within thirty (30) days after delivery of the disputing party's notice, the designees of both parties shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other will be honored.

(ii) If the matter has not been resolved by these persons within sixty (60) days of the disputing party's notice, or if the parties fail to meet within thirty (30) days, either party may initiate arbitration as provided hereinafter.

(b) <u>Arbitration</u>. Any controversy, dispute or claim arising out of or in connection with this Agreement, or the breach, termination or validity hereof or thereof, shall be settled by final and binding arbitration to be conducted by a sole arbitrator. The party initiating arbitration shall nominate one arbitrator in a request for arbitration and the other party shall nominate a second in the answer thereto within thirty (30) days of receipt of the request. The two arbitrators so selected shall select a third arbitrator who shall conduct the arbitration. If the answering party fails to nominate its arbitrator within the thirty (30) day period, or if the arbitrators named by the parties fail to agree on the third arbitrator within sixty (60) days, the office of the International Chamber of Commerce in Wilmington, Delaware, United States shall make the necessary appointments of such arbitrator(s). The location of the tribunal shall be in Wilmington, Delaware, United States. In the event of any procedural matter not covered by the aforesaid rules, the procedural laws of the State of Delaware shall govern. The decision or award of the arbitrator shall be final, and judgment upon such decision or award may be entered in any competent court or application may be made to any competent court for judicial acceptance of such decision or award and an order of

enforcement. Neither the arbitrator nor any court shall have authority to award punitive damages.

SECTION 6.08 <u>Governing Law</u>. This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with and governed by the internal laws of the State of Delaware, without giving effect to the conflict of law principles thereof to the greatest extent possible and with respect to matters not governed by the laws of Delaware by the laws of the Netherlands.

SECTION 6.09 <u>Severability</u>. In the event that any court of competent jurisdiction or arbitrator shall finally determine that any provision, or any portion thereof, contained in this Agreement shall be void or unenforceable in any respect, then such provision shall be deemed limited to the extent that such court or arbitrator determines it enforceable, and as so limited shall remain in full force and effect. In the event that such court or arbitrator shall determine any such provision, or portion thereof, wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect.

SECTION 6.10 <u>Interpretation</u>. The parties hereto acknowledge and agree that: (i) each party and its or his counsel reviewed and negotiated the terms and provisions of the this Agreement and the agreements and other documents contemplated hereby and have contributed to their revision; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

SECTION 6.11 <u>Headings and Captions</u>. The headings and captions of the various subdivisions of this Agreement are for convenience of reference only and shall in no way modify, or affect, or be considered in construing or interpreting the meaning or construction of any of the terms or provisions hereof.

SECTION 6.12 <u>Enforcement</u>. Each of the parties hereto acknowledges and agrees that the rights acquired by each party hereunder are unique and that irreparable damage would occur in the event that any of the provisions of this Agreement to be performed by the other party were not performed in accordance with their specific terms or were otherwise breached. Accordingly, in addition to arbitration pursuant to <u>Section 6.07(b)</u> hereof, each party hereto shall be entitled to seek in any court or administrative or governmental authority of competent jurisdiction an injunction or injunctions to prevent breaches or preserve the benefits of this Agreement by the other party and to enforce specifically the terms and provisions hereof.

SECTION 6.13 <u>Reliance</u>. The parties hereto agree that, notwithstanding any right of any party to this Agreement to investigate the affairs of any other party to this Agreement, the party having such right to investigate shall have the right to rely fully upon the representations and warranties of the other party expressly contained in this

Agreement and on the accuracy of any schedule or other document attached hereto or referred to herein or delivered by such other party or pursuant to this Agreement.

SECTION 6.14 Expenses. Eurofins, Operon and QNA shall bear 100% of their respective costs and expenses, including accounting, legal and due diligence costs, incurred hereto in connection with the preparation, negotiation, execution and delivery of this Agreement and the other agreements contemplated hereby and thereby

SECTION 6.15 Survival. Except as otherwise provided in this Agreement, the representations, warranties, covenants, agreements and indemnifications set forth or otherwise provided for in this Agreement shall survive the consummation of the transactions contemplated hereby and shall not be deemed waived or otherwise affected by any investigation made by or on behalf of any party hereto.

SECTION 6.16 Counterparts. This Agreement may be executed in one or more counterparts, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

EUROFINS VENTURES BV                    OPERON HOLDINGS, INC.

By: _____              By: _____

QIAGEN NORTH AMERICAN HOLDINGS, INC.

By: _____

24

Agreement and on the accuracy of any schedule or other document attached hereto or referred to herein or delivered by such other party or pursuant to this Agreement.

SECTION 6.14 <u>Expenses</u>. Eurofins, Operon and QNA shall bear 100% of their respective costs and expenses, including accounting, legal and due diligence costs, incurred hereto in connection with the preparation, negotiation, execution and delivery of this Agreement and the other agreements contemplated hereby and thereby

SECTION 6.15 <u>Survival</u>. Except as otherwise provided in this Agreement, the representations, warranties, covenants, agreements and indemnifications set forth or otherwise provided for in this Agreement shall survive the consummation of the transactions contemplated hereby and shall not be deemed waived or otherwise affected by any investigation made by or on behalf of any party hereto.

SECTION 6.16 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, and by different parties hereto on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement under seal as of the day and year first above written.

EUROFINS VENTURES BV

By: _____

OPERON HOLDINGS, INC.

By: _____

QIAGEN NORTH AMERICAN HOLDINGS, INC.

By: _____

24

# EXHIBIT B

Eurofins Finance S.A.
Luxembourg Branch
Rue H. Schnadt 10 A
L-2530 Luxembourg

Eurofins Genomics B.V.
Bergschot 71
4817 PA Breda
Netherlands

*Mer*

June 11, 2008

Re: **Note Purchase Agreement Default**

Gentlemen:

We refer to the Note Purchase Agreement (the "Note Purchase Agreement"), dated November 21, 2007 between Eurofins Finance SA, Luxembourg Branch ("Finance") and Eurofins Genomics BV ("Genomics") and our letter dated 29.05.2008 regarding interest due at that time in the amount of $ 545.058 through 31 May 2008. Pursuant to the Note Purchase Agreement, among other things, Genomics is obligated to pay interest to Finance on a current basis. Our records indicate that, in addition to the $545.058 due through 31 May 2008, interest at the default rate (20% p.a.) in the amount of US $ 149.049 will be due on 30 June 2008.

The Note Purchase Agreement is in default (among other reasons due to material adverse change and interest payment defaults) and demand is hereby made for payment of principal in the amount of $ 14.398.106 no later than 30 June 2008 and interest through the date of payment as stated above. You may pay these amounts in Euro and apply the official exchange rates in effect on the date of payment.

We received confirmation from Martin Riemen that the test date financials at 30.09.2007 have been confirmed and that the second tranche payments of purchase price are due to be paid under the several stock purchase agreements by 23.06.2008. Absent a default, a request to Finance to fund the payment of the second tranche of purchase price and for the exercise of the MWG Sales Option could be made before 1:00 p.m eastern standard time, five business days prior to borrowing date, using Exhibit D and Exhibit E of the Note Purchase Agreement. Unless the default is waived or cured in time, Finance will not make any additional advances under the Note Purchase Agreement. In any event, if we do not receive a request before 16.06.2008, we will assume that no further financing from Finance is necessary.

Finance is not waiving and expressly reserves its rights with respect to: (a) any defaults or events of default that may exist under the Note Purchase Agreement, (b) any rights Finance may have under the Note Purchase Agreement and (c) any obligations Genomics or others may have under the Note Purchase Agreement. Among other things, if the default is not waived or cured, Finance intends to exercise its rights against guarantors of the loan and with respect to the collateral for the loan. Nevertheless, Finance might be open under certain circumstances to restructuring the loan. Please contact Finance if you would like to explore that possibility.

Very truly yours,

(Hugues Vaussy)

# EXHIBIT C

Eurofins Finance S.A.
Luxembourg Branch
Rue H. Schnadt 10 A
L-2530 Luxembourg

Eurofins Genomics B.V.
Bergschot 71
4817 PA Breda
Netherlands

June 26, 2008

**Registered mail**

Re:  **Note Purchase Agreement Default**

Gentlemen:

Thank you for the documents you sent me and for the efforts you have made to provide them within a short time frame. I know that you have enormous work to catch up with the terrible state of accounting and finances at Operon at the moment.

Nevertheless, I must say that the information you sent me is very far from meeting even the minimum requirements for information normally requested by lenders / banks. It is too late in the process for me to describe to you again what is a normal data package for lenders and you can get this information from any external advisor.

By way of example, I am just pointing out below some aspects:

-   we have not received yet the audited accounts of Operon for FY2007 (reference is made to section 8.1 – Financial Statements of the Note Purchase Agreement stating under (a) that this information shall be provided to the Purchaser ie. Finance "in any event within 90 days after the end of each Fiscal Year, beginning with the Fiscal Year ending December 31, 2007");

-   we have not received the latest actual balance sheet as of the end of May 2008 for Operon Biotechnologies Inc., MWG Inc. and Operon GmbH;

-   from your Excel spreadsheets received today, no cash flow forecast was available nor any forecast balance sheet that are coherent with each other;

-   conservative budgets and associated cash flow planning for 2008 & 2009 with monthly breakdown and quarterly and annual subtotals showing the evolution since 2006 of each BU / company in the perimeter are missing, as well as details of all assumptions made to prepare the budgets and other information required to understand the financial tables;

-   in order for Finance as for any lender to assess Management's planning reliability, a comparison of the same original monthly / quarterly and annual budgets for 2006, 2007 and 2008 with actual performance should be provided.

It would take too much time to comment on the P&L you sent me but in passing I have just noted the following:

- external sales dropped from about $20 m in 2006 (cf. Operon official audited accounts) to $14.769 m in 2007;

- forecast external sales are expected to further drop to $ 12 m in 2008;

- the first 4 months of 2008 also show a continuing drop of external sales vs. the same period in 2007;

- if we assume that the increase of intercompany sales from $ 2.3 m in 2007 to $ 6.6 m in 2008 comes from MWG Inc., this would appear a very big increase for the 2nd half of the year compared to the last 6 months of 2007 at MWG Inc. To an outsider, in view of the continuous decrease since 2006, this seems very optimistic.

Summing up, I must confirm based on this final attempt my original position (cf. letter to Eurofins Genomics BV dated June 11, 2008) that in view of the drastic deterioration of the financial situation of the Operon companies and the lack of the most basic proper financial information/ controls, Eurofins Finance S.A., Luxembourg branch, ("Finance") is not in a position to provide funding any longer to Eurofins Genomics BV ("EGBV"), inter alia for the reasons explained previously and **demand is hereby repeated for full immediate repayment no later than 30th June 2008 of all amounts due to Finance under the Mezzanine loan pursuant to the Note Purchase Agreement, including the principal amount and all outstanding interests due as of end of June 2008 by EGBV**.

In addition to the points raised above, I would like to stress that the Mezzanine loan is in default for several reasons, including failure to pay other debt of at least $100,000. Please be informed that Finance intends to enforce its rights as a secured creditor.

Very truly yours,

Hugues Vaussy

# EXHIBIT D

EUROFINS VENTURES BV
Bergschot 71,
4817 PA Breda
The Netherlands

July 2, 2008

Operon Holdings, Inc.
c/o Richard Marsden, Esq.
Lanier Ford Shaver & Payne PC
200 Westside Square, Suite 5000
Huntsville, Alabama 35801
USA

                    Re:  Contribution Agreement / Forfeiture of Shares

Gentlemen:

        We refer to the Contribution Agreement, dated November 21, 2007, by and among Eurofins
Ventures BV ("EVBV"), Operon Holdings, Inc. ("Operon") and Qiagen North American Holdings,
Inc. ("QNA") (the "Contribution Agreement").

        Following approval of the Test Date Financials as of the 4th day of June, 2008, various
amounts were payable on June 23, 2008 (the "Adjustments") by certain of the parties to the
Contribution Agreement or agreements referred to therein. Adjustments had to be paid by Operon,
EVBV and EGBV. The Adjustments were not subject to offset and on the contrary the amounts due
from each party were summarized and signed off in the funds flow account details by Martin
Riemen (representing Gerard Blom) and Patrick Weiss, the CEO of EGBV and representing the
shareholder Operon at the 4th day of June, 2008.

        On June 23, 2008, EVBV paid in full the $ 2,697,278 capital distribution due from it to
Eurofins Genomics BV ("EGBV") and the $ 659,469 2nd tranche for Operon Japan due from it to
Operon Biotechnologies Inc. and did not offset (due to the desperate financial situation of EGBV)
any amount that was agreed on against amounts due under the various intercompany credit
agreements that are currently in default.

        Despite several requests after the 23rd of June, for payment or assurance of payment, Operon
has not paid the undisputed $ 1.294.942 due from it and has not given unconditional assurance that
this amount would be paid. Instead, Operon has proposed offsetting this amount due from Operon
against money due from Operon Biotechnologies Inc. to H&W Properties, a company that is fully
owned by the same shareholders as Operon Holdings.

        Eurofins stake in EGBV consisting of the capital contribution and the various loans is
unacceptably high compared to Operon's stake and exceeds the amount that was agreed in the
Contribution Agreement. Although the CEO of EGBV, who is also the representative of Operon, has
requested significant additional financing and accommodations from the Eurofins side, Operon
has declined to participate in funding EGBV's unanticipated needs and is in addition attempting to
retrieve and thereby reduce its money at risk.

Therefore, according to Section 1.01(b)(ii) of the Contribution Agreement, the failure by Operon to pay the undisputed $ 1,294,942 due from it to EGBV has resulted in the forfeiture by Operon of 21 shares of EGBV stock, effective on June 23, 2008 (the "Forfeiture"). $ 35.000 are still due after the forfeiture of the shares. The Dutch lawyers for EGBV will be given instructions to implement the Forfeiture. However, this administrative formality will not postpone the June 23, 2008 effective date of the Forfeiture.

As a result of the Forfeiture, Operon's holding in EGBV is 21,40% of EGBV's outstanding shares effective June 23, 2008 and since that date, Operon ceased to be entitled to board representation or to Supermajority voting requirements pursuant to the EGBV Shareholders Agreement.

As Qiagen's situation has not changed, Qiagen's observer rights continue.

Very truly yours,


Eurofins Ventures B.V.




Cc: Qiagen GmbH
    Qiagen Strasse 1
    40724 Hilden
    Attention: Dr. Philipp von Hugo

# EXHIBIT E

EUROFINS VENTURES BV
Bergschot 71,
4817 PA Breda
The Netherlands

July 8, 2008

Operon Holdings, Inc.
c/o Richard Marsden, Esq.
Lanier Ford Shaver & Payne PC
200 Westside Square, Suite 5000
Huntsville, Alabama 35801
USA

Re: Contribution Agreement / Purchase of Shares

Gentlemen:

By now, you should have received our July 3, 2008 letter relating to the consequences of the failure by Operon Holdings, Inc. ("Operon") to make a payment required by the Contribution Agreement, dated November 21, 2007, by and among Eurofins Ventures BV ("EVBV"), Operon and Qiagen North American Holdings, Inc. ("QNA") (the "Contribution Agreement") and agreements referred to therein or related thereto.

Our July 3, 2008 letter explained that the failure resulted in a "forfeiture" by Operon of Eurofins Genomics BV ("EGBV") shares. In fact, the failure entitles EVBV to purchase 21 EGBV shares held by Operon and EVBV hereby notifies Operon of EVBV's exercise of that purchase right. This letter repeats the underlying facts and restates the details of the consequences. As you will see, while the mechanism is different than that which was described in our July 3, 2008 letter, the consequences to Operon remain the loss of 21 EGBV shares.

Repetition of the Underlying Facts

Following approval of the Test Date Financials as of the 4th day of June, 2008, various amounts were payable on June 23, 2008 (the "Adjustments") by certain of the parties to the Contribution Agreement or agreements referred to therein. Adjustments had to be paid by Operon, EVBV and EGBV. The Adjustments were not subject to offset and on the contrary the amounts due from each party were summarized and signed off in the funds flow account details by Martin Riemen (representing Gerard Blom) and Patrick Weiss, the CEO of EGBV and representing the shareholder Operon at the 4th day of June, 2008.

On June 23, 2008, EVBV paid in full the $ 2,697,278 capital distribution due from it to Eurofins Genomics BV ("EGBV") and the $ 659,469 2nd tranche for Operon Japan due from it to Operon Biotechnologies Inc. and did not offset (due to the desperate financial situation of EGBV) any amount that was agreed on against amounts due under the various intercompany credit agreements that are currently in default.

Despite several requests after the 23rd of June, for payment or assurance of payment, Operon has not paid the undisputed $ 1,294,942 due from it and has not given unconditional assurance that this amount would be paid. Instead, Operon has proposed offsetting this amount due from Operon

against money due from Operon Biotechnologies Inc. to H&W Properties, a company that is fully owned by the same shareholders as Operon Holdings.

Eurofins stake in EGBV consisting of the capital contribution and the various loans is unacceptably high compared to Operon's stake and exceeds the amount that was agreed in the Contribution Agreement. Although the CEO of EGBV, who is also the representative of Operon, has requested significant additional financing and accommodations from the Eurofins side, Operon has declined to participate in funding EGBV's unanticipated needs and is in addition attempting to retrieve and thereby reduce its money at risk.

Restatement of the Consequences

Therefore, according to Section 1.01(b)(ii) of the Contribution Agreement, the failure by Operon to pay the undisputed $ 1,294,942 due from it to EGBV entitles EVBV to purchase from Operon 21 shares of EGBV stock for no consideration, effective on November 21, 2007 (the "Purchase"). EVBV hereby notifies Operon of EVBV's exercise of that purchase right. $ 35.000 are still due to EGBV from Operon after the Purchase.

Enclosed are papers to effect the Purchase (deed of sale and transfer of EGBV shares and power of attorney for Operon) to be executed by Operon and returned to EVBV as soon as possible. The Dutch lawyers for EGBV have been given instructions to implement the Purchase upon receipt of executed copies of these documents. However, this administrative formality will not postpone the November 21, 2007 effective date of the Purchase.

As a result of the Purchase, Operon's holding in EGBV is 19.60% of EGBV's outstanding shares effective November 21, 2007 and since that date, Operon ceased to be entitled to board representation or to Supermajority voting requirements pursuant to the EGBV Shareholders Agreement. Consequently, also included is a notice of EGBV shareholders meeting which is being called to remove Operon's designee to the Board.

As Qiagen's situation has not changed, Qiagen's observer rights continue.

Very truly yours,

Eurofins Ventures B.V.

Cc:  Qiagen GmbH
     Qiagen Strasse 1
     40724 Hilden
     Attention: Dr. Philipp von Hugo

# EXHIBIT F

Eurofins Ventures B.V.
Bergschot 71
4817PA Breda
Netherlands


Eurofins Genomics B.V.
Board of Directors
Bergschot 71
4817PA Breda
Netherlands

July 8, 2008

Re: Intercompany credit agreements


Gentlemen

We have not received the repayment of the € 6.965.780 which was loaned to Eurofins Genomics BV ("Genomics") under the intercompany credit agreement and was due by June 30, 2008. There is a second loan, balance per 30.06.2008 incl. interest amounts to € 1.122.610 under another intercompany credit agreement that is due by July 23, 2008. According to Section 5.1 of this second intercompany credit agreement, this second loan is now in default and we hereby demand immediate repayment of principal and accrued interest.

We hereby demand immediate and full repayment of the loans totaling 8.088.391 (incl. interest) at 30.06.2008. If you are not able to fulfill your obligation, we will grant you an extension, to no later than July 31, 2008, to repay these loans provided you sign and return this letter by July 10, 2008. During that time we will not take action.

It is our impression that Genomics shows a very high risk of insolvency and this increases our risk as a debt provider. However, we are not fully aware of the financial situation in the US due to the lack of any proper financial reporting. Nevertheless, it is the intention of EVBV to increase the interest rate on these loans to a default rate of interest equal to 20% per annum (but not more than the maximum rate of interest permitted by applicable law), starting July 1, 2008.

The default interest is due and payable in monthly arrears, commencing on July, 31, 2008. If Genomics is not able to pay the interest due through and including July, the monthly arrear will be deferred and added to principal.

Please be aware that we will analyze the situation at July 31, 2008 again and decide afterwards which steps we take. If you agree with the

postponement of the loans by one month and the above interest please sign this letter below.

Very truly yours,

EUROFINS VENTURES B.V.

Agreed and accepted as of the date first written above:

By: _____ (sign)

_____ (print name)

_____ (capacity in which signed)

Cc:    James Hudson, via Richard Marsden;
       Roland Sackers, Qiagen

# EXHIBIT G

# OPERON HOLDINGS, INC.

July 10, 2008

Eurofins Ventures BV
Bergschot 71, 4817 PA Breda
Attention: Geradus Blom

Jonathan B. Lapin, Esq.
575 Madison Avenue, Floor 25
New York, NY 10022

Richard Marsden, Esq.
Lanier Ford Shaver & Payne PC
200 Westside Square, Suite 5000
Huntsville, Alabama 35801

Qiagen North American Holdings, Inc.
19300 Germantown Road
Germantown, MD 20874
Attention: CFO

QIAGEN GmbH
QIAGEN Strasse 1
40724 Hilden
Attention: Dr. Philipp von Hugo

      RE:    Initiation of Dispute Resolution Procedures

Gentlemen:

      We are in receipt of your July 2, 2008 letter titled "Contribution Agreement/Forfeiture of Shares." For ease of construction, unless otherwise defined, capitalized terms in this letter refer to defined terms set forth in the various documents previously provided to all parties as part of the Closing Binder related to the several transactions between Eurofins Ventures BV ("EVBV"), Eurofins Genomics BV ("EGBV"), Eurofins Genomics, Inc. ("EGDeL"), Eurofins Finance SA, Luxembourg branch ("Finance Entity"), Operon Holdings, Inc., Phoenix Acquisition, Inc. and Operon Biotechnologies, Inc.

      By this letter, we formally dispute, pursuant to the Dispute Resolution process described in Section 6.07(a)(i) of the Contribution Agreement, the "Forfeiture" of 21 shares of EGBV stock as described in your letter.

Eurofins Ventures BV
July 10, 2008
Page 2 of 3

While your letter states that Operon proposed offsetting the $1,294,942 price adjustment by the approximately $1.7 million (not including interest) owed to H & W Properties, it fails to mention that this was agreed to at the June 4th meeting held in Brussels. The decision to offset the $1,294,942 appears to be an EGBV matter, and acceptance of this offset should be clarified with EGBV directly. It is worth noting that the $1.7 million payment under the renegotiated lease with H & W was fundamental to the transactions contemplated under the Contribution Agreement, with the ultimate value of Operon Biotechnologies being reduced dollar-for-dollar by this amount. Put another way, had H & W simply forgiven $1,294,942 of the debt owed to it, the purchase price adjustment to be paid by Operon Holdings would have been reduced to zero.

In addition, there are other issues to be addressed through the Dispute Resolution process. First, we believe that as of the Closing, there was no intention by EVBV (or its affiliates) to allow EGBV to use its available resources to service the Mezzanine Financing, which would (and has) ultimately led to a claim of default under such debt and the potential forfeiture of all assets of EGBV and its subsidiaries to a Eurofins affiliate. As such, we believe that Operon Holdings was fraudulently induced into entering the Contribution Agreement, the Put-Call Agreement, and the other Transaction Documents. Had Operon Holdings known that its capital contribution of $5 million dollars would be misdirected, Operon Holdings would not have entered into the transaction.

While paragraph 1 of the "BACKGROUND" of the Contribution Agreement contemplates repayment of the Pre-Closing EGBV debt to Finance Entity (defined as Eurofins Finance SA), our understanding is that there was no such debt owed. The EGBV debt owed to Finance Entity was not documented until January, 2008. Even if there had been Pre-Closing EGBV debt owed to Finance Entity, we do not believe the Contribution Agreement called for the transfer of all of the Company's cash to pay down such debt. Rather, the payments (over an unspecified term) would come from a combination of Mezzanine Financing, cash from Operon and capital contributions of Eurofins (presumably in the form of MWG shares), with such resources to be properly allocated by the Board of Directors.

Additionally, the timing of the Test Date financial audit report, continuing resistance from Eurofins affiliates to implement planned for transitions, and other suspect decision making by Eurofins controlled officers and directors of EGBV support our belief that EVBV (and its affiliates) schemed to defraud Operon Holdings and prevent it from obtaining the benefit of its investment under the Contribution Agreement, the Put-Call Agreement, and the other Transaction Documents.

Eurofins Ventures BV
July 10, 2008
Page 3 of 3

Please provide a response to this notice pursuant to Section 6.07(a)(1) of the Contribution Agreement. With respect to any meeting to attempt a resolution of the above issues, Operon Holdings will be represented by Patrick Weiss and members of Operon Holdings' legal team, to include Richard Marsden and up to two additional lawyers.

Sincerely,

Patrick Weiss
CEO, Operon Holdings, Inc.

RJM:cb

# EXHIBIT H

EUROFINS VENTURES BV
Bergschot 71,
4817 PA Breda
The Netherlands

Operon Holdings, Inc.
Patrick Weiss
c/o Lanier Ford Shaver & Payne PC
200 Westside Square, Suite 5000
Huntsville, Alabama 35801
USA

July 22, 2008

**Re: Your July 10, 2008 letter / Dispute Resolution**

Dear Patrick:

Thank you for Operon Holdings Inc.'s ("OHI") July 10, 2008 letter (the "July 10 Letter"). Eurofins Ventures BV ("EVBV") is eager to resolve any and all disputes with OHI as soon as possible. This letter constitutes the response to the July 10 Letter required by Section 6.07(a) (i) of the Contribution Agreement ("Dispute Resolution"). As you will see, this letter talks about OHI and you, Patrick Weiss, (personally) and to avoid confusion between you (representing OHI) and you (personally), refers to you (personally) as PW and uses "you" to refer to you in both capacities.

Before addressing the specifics of the July 10 Letter, I would like to remind you that Eurofins Genomics BV ("Genomics") and Operon Biotechnologie GmbH, the subsidiary recently acquired from Operon Holdings Inc., are in a perilous financial condition, with precious little time to act and few options from which to choose. The situation is made worse during this difficult time by what appears to be PW's recent inaction as director and\or President, even with respect to day to day matters like the signature of intercompany agreements in order to forward funds from Genomics to its subsidiaries (something to which PW agreed in the 27th of June board meeting and which is necessary because these subsidiaries are insolvent without these additional funds). These companies are still alive only because Eurofins Group companies have not yet demanded payment of amounts due, as any third party would have done. EVBV views this inaction as PW's subordination of officer and director responsibilities to what appear to be conflicting interests as a shareholder. Whether or not PW has been advised by personal advisors, for his own personal reasons, to not to sign anything anymore, this inaction is not acceptable in PW's role as director and\or CEO of Genomics. In this context, we want to make clear that EVBV sees the allegations made in the July 10 Letter as being not genuine and only deliberately dilatory and intends, among other things, to obtain damages from all appropriate parties for avoidable harm to Genomics, its subsidiaries and affiliates resulting from inaction (that is, PW's inaction as CEO and a director of Genomics and the various subsidiaries for which PW took director responsibilities as well as inaction caused by stalemate) during the Dispute Resolution process.

It is impossible for OHI to dispute in good faith that it owes Genomics $1,294,942, as that amount is stated to be due from OHI in the "Test Date Financials" which were unanimously approved on June 4, 2008 by the Board of Directors of Genomics, including PW. It is true that before the mid-day break in the preliminary discussions only concerning the sale of OHI's interest in Genomics to EVBV (a transaction which OHI had expressed an interest in pursuing before the meeting in Brussels), OHI mentioned that OHI might want to offset the overpaid amount against the $1.7 Million due from Operon to H&W Properties. However, after the break, OHI announced it was no longer interested in selling its Genomics shares. Despite the serious issues that the Genomics

group was facing, PW could on this occasion be motivated only to approve the Test Date Financials. The approval included a flow of funds document signed and initialed by PW, in which the amount and the accounts details were specifically mentioned. OHI led EVBV to believe that OHI intended to pay the agreed upon amount by the agreed upon due date and only after EVBV had made its payments of $ 3,356,747 required by the Test Date Financials approval did OHI state that it would not unconditionally pay its obligation of $1,294,942. Unlike the situation around the Mezzanine Financing discussed below, OHI's failure to pay Genomics would seem to be bad faith and fraudulent inducement. For example, (a) in the Closing report of June 4th (at the end of section 7 on page 11), there is a requirement of prompt notice of a party's unwillingness or inability to pay undisputed amounts required by the Closing Report with specific reference of the potential forfeiture of OHI's Genomics shares if it did not pay the amount the $1,294,942, and (b) on page 7 of the June 20th Eurofins Genomics Presentation prepared by PW and K Kuegler to convince Finance to postpone its Mezzanine Loan payment demand, PW states his assumption in preparing the presentation that there would be no payments to shareholders, including no payment for leasehold improvements to Hudson & Weiss LLC.

When the joint venture was first discussed, there was an understanding between the parties that each joint venture partner would fund the new entity according to its share in it. On this basis, Eurofins should provide 2/3 of the equity and 2/3 of the debt and OHI should provide 1/3 of the equity and 1/3 of the debt. However in the course of the negotiations, OHI, Jim Hudson and Qiagen sold as much debt as possible to Eurofins and Eurofins finally took 100% of the debt to finance the joint venture. A mezzanine loan construction was utilized in order to balance the risk and return associated with the JV and a maximum amount of $ 20 Mio. was agreed by the parties. After the signing, leasehold improvements were sold to Operon, although it should have been obvious to PW that, at that time, Operon did not have enough cash to pay for them. Presumably, OHI's objective was to further reduce its exposure in Genomics by another $ 1.7 Mio. and, if this amount had been paid as agreed in the purchase contract for the leasehold improvements, Operon would have become immediately bankrupt.

By making Eurofins believe that OHI would pay its Test Date Financials-related obligation, OHI maneuvered Eurofins to put more money at risk in the venture by paying its Test Date Financials-related obligations, money which legitimately could have been "offset" and will be completely lost if Genomics goes bankrupt. By paying all or a portion of the $1.7 Mio. leasehold improvements amount (whether in cash or by offset) at this time and under these circumstances, PW can be seen as prioritizing his personal interest over the interest of the Genomics Group, which was entrusted to him as CEO.

The Genomics Board approval of the Test Date Financials occurred after OHI's post-mid-day break refusal to sell its Genomics shares to EVBV and did not contemplate any "offset" of the money owed by OHI. The brief offset discussion was in the context of streamlining loose ends in a proposed acquisition by EVBV of OHI's entire interest in Genomics and any possibility of an offset ended before a mechanism could be agreed when OHI suddenly declined to pursue the sale of its Genomics shares. An offset was not agreed in any other context and, in fact, would be inconsistent with PW's call upon Genomics shareholders to support Genomics with additional loans and/or payment moratoria and in direct conflict with the Test Date Financials approval – which specifically called for payment from OHI to Genomics of the $1,294,942 by June 23, 2008. Furthermore, the leasehold improvements debt is owed by a legal entity other than Genomics and as OHI only sold 84% of Operon's shares, the consolidated share of this loan would be $ 1.428 Mio. and could therefore not be offset.

While the thought put into the explanation offered of why this payment is irrelevant or could be accomplished some other way is appreciated, it ignores the reality of the situation and is itself

nonresponsive to the issue at hand. Furthermore, in light of OHI's persistent refusal to review the Test Date Financials before knowing the resulting closing adjustments (see email from Richard Marsden dated 29.02.2008), it is difficult for EVBV to accept allegations by OHI that EVBV somehow postponed the completion of the Test Date Financials in order to put pressure on Genomics and\or OHI. For ease of reference, attached as <u>Exhibit 1</u> is a copy of the signed Test Date Financials approval and signed payment requirements/flow of funds instructions.

Similarly, EVBV sees the allegation in the July 10 Letter that it was EVBV's intention to not allow Genomics to use "available" resources to service the Mezzanine Financing as dilatory, without merit and equally disingenuous. First of all, just as in any corporate group, senior officers of Eurofins entities are charged with the obligation of running their companies in the best interest of those companies. They are not expected to compromise that obligation when transacting business with affiliates. This situation is no different. Furthermore, it was made clear from before the November 2007 Closing, that it would take time and effort before access to MWG cash would be possible, in light of the difficult relationship with minority shareholders. As you know, MWG AG ("<u>MWG</u>") is listed on the German stock exchange and OHI was fully aware that the relationship with minority shareholders was quite tense, as could be seen in the seven different active law suits (mostly with minority shareholders) relating to corporate development activities of MWG AG (see exhibit 13 of the subscription agreement). In fact, this was recognized in the context of, among other things, (a) the express exclusion of MWG and its subsidiaries from the Genomics Shareholders Agreement board composition and board and shareholder decision rules and (b) Genomics possible need for cash to pay dividends (a liquidity problem related to overall Genomics group profitability), as to which EVBV agreed to accommodate OHI by assisting to create liquidity for dividends in order to provide funds for OHI to service its debt. Let me be very clear here – the only context in which the transaction papers talk about accommodations to create liquidity in Genomics is in the case of Genomics group profitability and only for the purpose of enabling Genomics to pay dividends (which was explained to us as being necessary to service OHI bank debt).

Nevertheless, in response to groundless allegations that MWG and Eurofins Finance SA, Luxembourg branch ("<u>Finance</u>") were somehow being prohibited from cooperating with Genomics, the Board of Genomics gave PW and Klaus Kuegler the assignment to make compelling written presentations to Florian Heupel (with respect to actions requested of MWG) and to Hugues Vaussy (with respect to actions requested of Finance). It was clearly stated at the time that the written presentation by Messrs. Weiss and Kuegler should protect Genomics against the possibility of arbitrary decisions by Messrs. Heupel and Vaussy by establishing a written record supporting Genomics assertion that the actions requested of Messrs. Heupel and Vaussy not only benefited Genomics but were in the best and defendable interests of MWG and Finance, thereby putting Messrs. Heupel and Vaussy and MWG and Finance at risk for failing to take requested actions. Before the subject was closed during the Board meeting at which the presentation was discussed, a number of questions and suggestions were made to improve the presentation and to correct obvious mistakes but were rejected by PW and/or K Kluegler. In any event, we understand that Messrs. Heupel and Vaussy did not find the presentations compelling and EVBV fully expects that any arbitration panel assessing the presentations will come to the same conclusion.

Finally, the repayment of Genomics pre-closing debt (related to its MWG holdings) was discussed as a key element of the transaction for EVBV and contemplated by pre-closing organization charts (Exhibit M-2 of the contribution agreement, pages one and two) and by the closing documents and was referred to in § 7 (v) of the contribution agreement.

You must be aware, that as of June 30, 2008 Eurofins had contributed $ 10 Mio. in equity and $ 26.9 Mio. in intercompany loans and Mezzanine Debt, totaling a total amount of $ 36.9 Mio.,

whereas OHI contributed $ 5 Mio. in equity which was generated from Eurofins' contribution. That is 1/8 compared to 7/8 of Eurofins contribution to the joint venture. To say otherwise, is simply incorrect. In February, before the Test Date Financials were agreed upon, Eurofins immediately provided additional funds requested by Operon and at that time PW did not complain that the five million of Operon's capital contribution were immediately applied, when received in December 2007, to pay down intercompany debt and thereby reduce the interest burden. For ease of reference, attached as Exhibit 2 are several of those charts. The reason for Genomics cash problem is the poor performance of the US side of the Genomics group which was totally unexpected by EVBV, particularly compared to 2006 and because Operon has not paid any interest so far on any of the loans that were sold by Jim Hudson and Qiagen and purchased by Genomics (which interest was intended to service some of Genomics debt) – not the scheduled repayment of Genomics pre-closing debt.

In summary, EVBV believes that the July 10 Letter does not present legitimate disputes and, in the context of PW's apparent abandonment of officer and director responsibilities (including following through with actions he approved), can only be for dilatory or other purposes unrelated to the interests of Genomics. Nevertheless, EVBV is prepared to meet to resolve the "dispute" at your earliest convenience but expects that during this period Genomics will be diligently and properly managed. OHI should have received our July 17, 2008 letter indicating that, in light of the July 10 Letter, EVBV intended to condition its vote to remove PW as a director of Genomics based upon EVBV's entitlement to Genomics shares held by OHI (as indicated in EVBV's July 2 and 8, 2008 letters). Nevertheless, in order to allow time for a rapid resolution of OHI's dispute, EVBV did not hold the meeting and requests that OHI and PW agree by 15.00 o'clock (Brussels time) on July, 25th to schedule a joint shareholders and directors meeting of Genomics during or immediately after the dispute resolution session proposed below. EVBV expects that other activities will be conducted in parallel with the resolution of the "dispute", appropriately conditioned.

Please let us know when your team is available to meet. We suggest that the dispute resolution session and board and shareholders meeting occur in New York City sometime between July 27 and August 1, 2008. From the EVBV side the team will consist of Jonathan Lapin and Martin Riemen.

Very truly yours,

(Gerard Blom)

Cc:    Qiagen GmbH, Qiagen Strasse 1, 40724 Hilden, Attention: Dr. Philipp von Hugo
       Richard Marsden, Esq., Lanier Ford Shaver & Payne PC, 200 Westside Square, Suite 5000
       Huntsville, Alabama 35801

Exhibits:
1. Copy of the signed Test Date Financials approval and signed payment requirements/flow of funds instructions
2. Exhibit M-2 of the contribution agreement, pages one and two

# EXHIBIT I

# LANIER FORD
## SHAVER & PAYNE



**Richard J. Marsden**
rjm@lfsp.com

Telephone (256)535-1100
Facsimile (256)533-9322

July 22, 2008

EUROFINS VENTURES BV
Bergschot 71
4817 PA Breda
The Netherlands

Attention: Gerard Blom

> Re:    Your July 22, 2008 Letter/Notice of Claim for Indemnification

Dear Mr. Blom:

In response to your letter to Patrick Weiss of July 22, 2008, I have discussed with Jonathan Lapin the scheduling of a dispute resolution session in New York next week. In advance of that session, I am writing to provide notice that Operon Holdings, Inc. ("OHI") intends to demand full indemnity from Eurofins Ventures BV ("EVBV") for any losses or damages resulting from the failure by Eurofins Genomics BV ("Genomics") to perform its obligations under the Note Purchase Agreement between Genomics and Eurofins Finance SA ("Finance"). OHI also will seek indemnity for any losses or damages resulting from the failure by Genomics to perform its obligations under an intercompany credit agreement.

Indemnity will be sought pursuant to Article V of the Contribution Agreement. Under Section 5.01, EVBV is obligated to indemnify OHI against any and all losses or damages "of any kind or character . . . arising out of or in any manner incident, relating or attributable to . . . [a]ny failure by any Eurofins company to perform or observe . . . in full, any material covenant, agreement or condition to be performed or observed by it under this Agreement [or] any other Eurofins Agreement." The Contribution Agreement expressly defines the phrase "Eurofins Company" to include Genomics. *See* Section 2.01. The Contribution Agreement defines the phrase "Eurofins Agreements" to include

200 West Side Square, Suite 5000 ● Post Office Box 2087 (35804) ● Huntsville, AL 35801 ● www.lfsp.com

Eurofins Ventures BV
July 23, 2008

Page 2
_____

the Contribution Agreement and the other agreements or instruments to which any Eurofins company is a party. *See* Section 2.02. This would include the Note Purchase Agreement between Genomics and Finance.

As you know, by letter to Genomics of June 11, 2008, Finance declared that the Note Purchase Agreement "is in default (among other reasons due to material adverse change and interest payment defaults)." (June 11, 2008 letter from Hugues Vaussy of Finance to Genomics). By subsequent letter of June 26, 2008, Finance informed Genomics that "Finance intends to enforce its rights as a secured creditor." (June 26, 2008 letter from Hugues Vaussy of Finance to Genomics). If Finance carries out its threat, OHI will be severely damaged due to Genomics' failure to perform under the Note Purchase Agreement.

As you are also aware, EVBV has asserted the right to take certain actions because two intercompany credit agreements entered into by Genomics are in default. (See July 8, 2008 letter from EVBV to Genomics Board of Directors). One of those agreements appears to relate to the "Pre-Closing EGBV Debt" which Genomics was required to pay under the terms of the Contribution Agreement. OHI also will seek indemnification for any losses or damages resulting from a failure by Genomics to perform its obligations under that agreement.

I note that Section 5.04 of the Contribution Agreement generally limits liability for indemnification to $5 million. Without conceding that this damage limitation could be enforceable at all, I note that Section 5.04 also expressly provides that "there shall be no limit on Damages or other amounts payable to any party resulting from acts of fraud by any other party." The damages to OHI will greatly exceed $5 million.

In the event the disputes between EVBV and OHI are not resolved, OHI will make a formal indemnity demand under Section 5.03 at the appropriate time.

Sincerely,

Richard J. Marsden
Counsel for Operon Holdings, Inc.

cc:    Jonathan B. Lapin
        Qiagen North American Holdings, Inc.
        Dr. Philipp von Hugo/QIAGEN GmbH

# EXHIBIT J

# JONATHAN B. LAPIN
**Attorney at Law**
**575 Madison Avenue, 25th Floor**
**New York, New York  10022-1614**

Facsimile +1.212.755.6385                                  Telephone +1.212.751.7528
jlapin@constantinusa.com; or
jblapin@gmail.com

July 28, 2008

BY FEDERAL EXPRESS AND EMAIL
[rjm@lfsp.com]

Operon Holdings, Inc.
c/o Richard Marsden, Esq.
Lanier Ford Shaver & Payne
200 West Side Square, Suite 5000
Huntsville, AL 35801

Re:  Letter from Operon Holdings Inc. ("OHI"), dated July 22, 2008 letter

Dear Richard:

As OHI's July 22, 2008 letter (the "July 22 Letter") to Eurofins Ventures BV ("EVBV")
was sent by you, EVBV has asked me to reply.

EVBV understands from the July 22 Letter that OHI has not made an indemnification
claim against EVBV under the Contribution Agreement related to failure by Eurofins Genomics
BV ("Genomics") to repay its intercompany debt ("Intercompany Debt") and/or its debt to
Eurofins Finance SA, Luxembourg Branch ("Mezzanine Debt") as detailed in the July 22 Letter,
but is giving some sort of advanced warning of OHI's intention to make such a claim at some
point in the future.  As the July 22 Letter has been explicitly described by OHI to not be a notice
of claim, EVBV will not respond at this time to the suggestion by OHI that the circumstances
described in the July 22 Letter would result in any damage to OHI or damage as to which EVBV
has any obligation, other than to say that any such suggestion is without merit.

Nevertheless, as a natural corollary to that which OHI states in the July 22 Letter and
totally independent of OHI's suggestion of some sort of entitlement to indemnification if such
performance results in "damage" to OHI, EVBV has concluded from the July 22 Letter that OHI
agrees that Genomics is entitled to perform its obligations with the respect to the Intercompany

**JONATHAN B. LAPIN**

Operon Holdings, Inc.
Page 2
July 28, 2008

Debt and the Mezzanine Debt and that OHI accepts some responsibility for insuring that Genomics does perform.

Unless EVBV receives immediate written notice from OHI to the contrary, EVBV will assume that its aforesaid conclusion is correct and will expect OHI to fully cooperate with efforts by Genomics to perform or otherwise satisfy Genomics' Intercompany Debt and Mezzanine Debt obligations.

Very truly yours,

Cc: Patrick Weiss [Patrick.weiss@operon.com]
    Richard Marsden, Esq. [rjm@lfsp.com]
    Qiagen North American Holdings, Inc.
    Dr. Philipp von Hugo/Qiagen GmbH {philipp.vonHugo@qiagen.com}